**IN THE UNITED STATES DISCTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORGISTA FILOXENE<br>283 Park Street, Apt B17<br>York, PA 17401<br><br>Plaintiff,<br><br>v.<br><br>FEDEX SUPPLY CHAIN<br>DISTRIBUTION SYSTEM, INC.,<br>d/b/a FEDEX SUPPLY CHAIN<br>700 Cranberry Woods Drive<br>Cranberry Twp., PA 16066<br><br>Defendant. | CIVIL ACTION<br><br>NO.: ___________________________<br><br>**JURY TRIAL DEMANDED** |

## <u>CIVIL ACTION COMPLAINT</u>

Lorgista Filoxene (hereinafter referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

## <u>INTRODUCTION</u>

1. Plaintiff has initiated this action to redress violations by FedEx Supply Chain Distribution System, Inc. (hereinafter referred to as "Defendant") of the Americans with Disabilities Act, as amended ("ADA" - 42 U.S.C. §§ 12101 et. seq.), Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 200(d) et. seq), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), and the Pennsylvania Human Relations Act ("PHRA").[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

[1] Plaintiff intends to amend her instant lawsuit to include claims under the PHRA once her administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission ("PHRC").

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's intended state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly assert personal jurisdiction over Defendant because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where they are subjected to personal jurisdiction, rendering Defendant a resident of the Middle District of Pennsylvania.

5. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing her Charge and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address as set forth in the caption.

8. Defendant FedEx Supply Chain Distribution System, Inc., upon information and belief, was a wholly-owned subsidiary of FedEx Corporation[2], and operates over 130 different warehouse facilities across the United States, including the 325 S. Salem Church Road, York, PA 17408 warehouse location where Plaintiff worked.

9. At all relevant times herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is a Black Haitian female.

12. Plaintiff immigrated to the United States from Haiti in or about 2020.

13. Plaintiff was hired by Defendants on or about November 30, 2022; in total, she was employed by Defendants for approximately 3.5 years, until her unlawful termination (discussed in more detail *infra*) on or about April 23, 2026.

14. During her tenure with Defendants, Plaintiff was assigned to the role of "Packer."[3] As a Packer, Plaintiff was responsible for placing items into boxes, sealing those boxes, and attaching necessary labels for shipment.

15. Throughout her approximate 3.5 years of employment, Plaintiff was an exemplary employee who performed her job well.

---

[2] Which former Parent company sold this subsidiary portfolio to CMA CGM Group in or about October of 2026. Plaintiff named FedEx Inc. (the parent corporation during the time in question) in her original EEOC Charge. Plaintiff reserves the right to amend to include the parent company if discovery shows the named Defendant was not a wholly owned subsidiary operating without significant oversight and control over Plaintiff by its parent company.

[3] Plaintiff was also asked, on occasion, to perform other duties in the warehouse, including that of "Receiver." As a Receiver, Plaintiff stood in one location and scanned products for distribution.

16. Raymond Beato (hereinafter "Beato") and Alex Last Name Unknown ("Alex") were two (2) of Plaintiff's supervisors towards the end of her employment with Defendants.

17. Beato is a Hispanic male who was born in the United States and held the title of Supervisor during Plaintiff's employment.

18. Alex is a White male who was born in the United States and held the title of Manager during Plaintiff's employment; Alex was Beato's superior.

**-Defendants Harbored a Clear Animus Toward Plaintiff's Actual/Record/Perceived Disabilities as an Amputee-**

19. Plaintiff is an amputee; she has only one (1) leg, as the other leg was amputated after Plaintiff sustained an injury in the catastrophic earthquake that struck Haiti in 2010.

20. Thus, Plaintiff stands and walks with the assistance of a prosthetic leg.

21. Plaintiff has and continues to suffer from ADA-qualifying disabilities, as she suffers from a physical impairment, which at times, substantially affects her ability to perform some daily life activities, including bending, walking, standing, and climbing stairs.

22. Plaintiff's disability was made known to Defendants upon hire and was commonly known on the warehouse floor.

23. Given the various positions available for assignment in the warehouse (Packer, Picker, Receiver etc.), Plaintiff had always pursued formal medical accommodations including most recently via Defendants' "ADA Medical Assessment Form," submitted on or about January 23, 2026.

24. In the ADA assessment form, Plaintiff's medical provider confirmed Plaintiff suffered from a physical impairment (amputee) with "limitation with excessive walking and descending stairs," and which noted "can ascend and descend the stairs a total of 5 times per shift; can walk one hour at a time without needing to stop and sit; unlimited ability to stand."

25. In connection with her limitations, Plaintiff worked well as a Packer for many years, as this position did not require excessive walking or repeated use of stairs.

26. Though Plaintiff had been led to believe her accommodation requests had been granted (as she historically worked as a strictly a Packer to accommodate her medical needs), Plaintiff received a call from Human Resources in or about March of 2026 inquiring if her impairment was permanent. (This is illogical as Plaintiff was am amputee and it was obvious any restrictions based upon her capability of excessive walking/stairs were permanent).

27. Plaintiff confirmed with HR that her physical limitations were permanent.

28. Plaintiff was then abruptly terminated for her medical condition and related limitations in late April of 2026.

29. Beato called Plaintiff in for a meeting on or about April 23, 2026.

30. During this meeting, Beato thanked Plaintiff for her hard work, but told her she was being terminated because of her handicap due to the fact that she could not work in all departments, and could not work as a Picker.

31. Pickers at Defendants' facility are tasked with searching for, collecting, and delivering items to Packers (and thus, this position required more extensive walking/stair climbing than that of a Packer).

32. Defendants management did not explain *why* Plaintiff needed to suddenly become a Picker, but more importantly, if necessary to maintain her job – Plaintiff would have accepted any position offered (including Picker).

33. Based upon management's clear views on her disabled status, the topic clearly was not up for discussion, as they did not believe Plaintiff could Pick.

34. Throughout Plaintiff's employment, Plaintiff observed many workers who were asked to Pick (but politely declined) and Defendant's management did not force the issue.

35. Thus, Plaintiff was never under the impression Picking was an essential function of the job.

36. If Defendants were claiming all of a sudden Plaintiff needed to Pick (as no Packing opportunities were available, which she does not believe to be the case) – she would discussed with Defendants and her doctor feasible accommodations for this role, as Plaintiff could Pick if she had to.

37. Defendants declined to engage in any type of interactive process, however, and made bold assumptions that Plaintiff could never work as a Picker because of documented permanent amputee status, and related physical limitations.

38. Plaintiff could have worked as a Picker with reasonable accommodations, but was denied any interactive process.

39. Defendant terminated Plaintiff expressly because of their incorrect perceptions and prejudices about her disability.

**-Race/Ethnicity/National Origin Discrimination-**

40. While Plaintiff believes and avers that her disability was the primary motivating factor in her termination, Defendant also subjected Plaintiff to constant disparate treatment on the basis of her race/ethnicity/national origin.

41. Plaintiff's native language is Haitian Creole, and she cannot communicate in English.

42. Plaintiff primarily communicated with Defendant through other Haitian employees who acted as translators.

43. Plaintiff observed, throughout her employment, that Defendant treated Black and Haitian employees worse than White or Hispanic employees.

44. Some instances of Defendant's discriminatory mistreatment included, but was by no means limited to:

a. Asking Black or Haitian Packers to temporarily perform the (less desirable) duties of Pickers more often than White or Hispanic employees;

b. Issuing write-ups to Black or Haitian employees who declined to temporarily work as Pickers, while generally permitting White and Hispanic employees to decline without discipline;

c. Demonstrating clear preference for non-Haitian employees in promotion and demotion decisions, promoting non-Haitian employees to supervisory and managerial positions over Black or Haitian employees with more experience and equivalent if not superior performance;[4]

d. Disregarding and failing to address workplace concerns raised by Black or Haitian employees, including concerns about discrimination, but punishing Haitians without conducting full investigations when White or Hispanic employees accused them of misconduct;

e. Criticizing Black or Haitian employees for their productivity without any basis, while allowing White and Hispanic employees to stop working and speak with supervisors about matters unrelated to work (causing impacted productivity numbers), without any repercussions;

45. Moreover, Defendant accommodated at least two (2) non-Haitian employees with mobility restrictions by allowing them to work as Pickers exclusively on the first floor of the Facility.

---

[4] By way of example, Defendant demoted all three Haitian Point Leads in early 2025 while keeping the only White Point Lead in that role. This was even though Haitian Point Leads had more experience in the role and had worked for Defendant for longer.

46. Thus, in addition to make assumptions about whether or not Plaintiff could be medially accommodated, they declined to make accommodations which they had openly permitted for two (2) non Haitian workers.

47. Defendant fired Plaintiff without proposing the accommodation that they were already providing non-Haitian employees to enable them to perform the position that they (incorrectly) assumed Plaintiff could not perform due to her disability.

48. Plaintiff believes and therefore avers that she was also terminated because of her race/ethnicity/national origin.

**COUNT I**
**<u>Violations of the Americans with Disabilities Act, as Amended ("ADA")</u>**
**([1] Actual/Perceived/Record of Disability Discrimination; [Retaliation] and [2] Failure to Accommodate)**

49. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

50. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities as set forth *supra*.

51. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job as Packer (and in other departments) well with Defendants.

52. Plaintiff kept Defendants informed of her disability throughout her employment and sought formal medical accommodations as recently as January 23, 2026.

53. After submitting her ADA accommodation request, Plaintiff was terminated within a few months thereafter (despite being a good performer without any meaningful discipline on her record).

54. Plaintiff never relayed to Defendants she could not work as a Picker; she simply asked for accommodations related to excessive walking/stairs.

55. Plaintiff could have been reasonably accommodated if she was required to be a

Picker (which she does not even believe was the case), and could have worked with her doctor to discuss assignment more frequently to one particular floor (to avoid routine stairs), or permission for breaks as needed.

56. Defendants, however, failed to engage in the interactive process despite Plaintiff having made her ADA-qualifying condition & limitations known to Defendants.

57. Plaintiff was terminated, on or about April 23, 2026, explicitly because of her amputee status and their misperceptions she could not ever Pick.

58. Defendants' actions as aforesaid constitute violations of the ADA.

**COUNT II**
**Violations of 42 U.S.C. Section 1981**
**(Race Discrimination)**

59. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

60. During Plaintiff's employment with Defendants, she was subjected to discrimination through disparate treatment, pretextual admonishment and/or discipline, and demeaning and/or derogatory treatment because of her race. These actions as aforesaid constitute unlawful discrimination under Section 1981.

**COUNT III**
**Violations of Title VII**
**(Race/Ethnicity/National Origin Discrimination)**

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. During Plaintiff's employment with Defendants, she was subjected to discrimination through disparate treatment, and pretextual admonishment and/or discipline, and demeaning and/or derogatory treatment because of her race/ethnicity/national origin. These actions as aforesaid constitute unlawful discrimination under Title VII.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting discrimination in the future against any employee(s);

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiffs is to be awarded punitive and/or liquidated damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for their willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F. Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: ______________________

Ari R. Karpf, Esq. (ID No.: 91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
akarpf@karpf-law.com

Dated: October 8, 2026